UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

JUAN GOMEZ,
        Plaintiff,

v.   03-2084

DONALD N. SNYDER, et al.,
        Defendants.

MEMORANDUM OPINION AND ORDER

Before the court are the Defendants, Dr. Ikechukwu Uzoaru, Wexford Health Sources, Inc., and Dr. David E. Rowe's revised summary judgment motion [110], the Pplaintiff's response [118] and the Defendants' reply [120]. The Defendants move for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.

Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e).

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in

1

observation or other first-hand personal experience. They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659.

## Background

The Plaintiff claims that the Defendants Dr. Uzoaru, Dr. Rowe, and Wexford Health Sources, Inc. were deliberately indifferent to his serious medical needs. Plaintiff claims to suffer from low back pain and from ankle clonus (the shaking in his ankles) as a result of suffering from herniated discs in his neck. Plaintiff believes that he should have been diagnosed with this condition earlier and that the care and treatment provided to him in the form of an MRI, a neurology consult, and a steroid injection should have been provided to him sooner and that the delay caused by an initial denial of the procedures by Wexford constituted deliberate indifference to a serious medical need by Wexford, Dr. Rowe, and Dr. Uzoaru. Defendants deny that the Plaintiff was treated with deliberate indifference and further deny that Plaintiff was treated inappropriately with respect to any medical condition from which he may suffer. Defendants also deny that Plaintiff was injured as a result of the minor delay in obtaining the medical tests and steroid injections recommended by Plaintiff's physicians. For these reasons, Defendants believe summary judgment is appropriate.

## Material Facts Claimed to be Undisputed[1]

1. Plaintiff, Juan Gomez, is currently incarcerated at the Dixon Correctional Center.
2. Plaintiff was seen by Dr. Ike Uzoaru, the Medical Director at the Danville Correctional Center during the time frame referenced in Plaintiff's Complaint.
3. The Plaintiff's claim against Dr. Uzoaru is based on inadequate medical care and deliberate indifference with respect to Plaintiff's various medical conditions. (See Deposition of Juan Gomez, p. 8.)
4. Plaintiff suffers from ankle clonus. (Gomez Deposition, p. 9; see also Affidavit of Dr. Uzoaru, attached hereto as Exhibit A.)
5. Plaintiff was advised that one of the possible diagnoses for his ankle clonus was multiple sclerosis. (Gomez Deposition, p. 9.)
6. Dr. Uzoaru recommended two (2) MRIs which were performed, but came back inconclusive with respect to multiple sclerosis. (Gomez Deposition, pp. 9-10.)
7. In 2003, the Plaintiff was sent to the University of Illinois Chicago where he was diagnosed with herniated discs in his neck. (Gomez Deposition, p. 10.)

---

[1]Plaintiff in this case attempts to create issues of fact by referencing current conditions and treatment subsequent to the time that he was seen by the Defendants in this case. The court can only consider facts that are relevant to the time period of the Plaintiff's claims against the Defendant. Exhibits are Defendants' exhibits (found at d/e 110), except when referred to as Plaintiff's Exhibit (found at d/e 118).

8. Plaintiff believes that Dr. Uzoaru should have diagnosed him with the herniated disc sooner. (Gomez Deposition, p. 10.)
9. Plaintiff also complains that he did not receive a back brace. (Gomez Deposition, p. 10.)
10. However, no doctor has indicated that Plaintiff's herniated disc arose from the fact that he did not have a back brace. (Gomez Deposition, pp. 10-11.)
11. Plaintiff admits that Dr. Uzoaru recommended that an MRI be performed, that the Plaintiff see a neurologist, and that steroid injections be given to the inmate. (Gomez Deposition, pp. 11-13.)
12. Plaintiff did in fact receive care and treatment recommended by Uzoaru in the form of an MRI, a neurology consult, and the steroid injections. (Gomez Deposition, pp. 11-13.)
13. Plaintiff's complaint is that his care and treatment was delayed as a result of the initial denials by Wexford. (Gomez Deposition, pp. 11-13; see also Exhibit A.)
14. Plaintiff's claim against Wexford is also based upon its denial and delay of the requests for approval of medical care recommended by Dr. Uzoaru and other medical specialists. (Gomez Deposition, p. 17.)
15. Despite Plaintiff's contentions, no medical provider has indicated to him that if the MRI, neurology visit, and epidural steroid injection were performed sooner, his overall condition would be any different. (Gomez Deposition, p. 18.)
16. Plaintiff was provided with pain medication for his complaint regarding his low back pain. At the time of his deposition, the Plaintiff was not satisfied with the care and treatment being provided to him at the Danville Correctional Center subsequent to the diagnosis of herniated discs. (Gomez Deposition, pp. 13-14.)
17. Plaintiff is capable of exercising. (Gomez Deposition, p. 18.)
18. While the Plaintiff claims Dr. Uzoaru began treating him on September 23, 1999, Dr. claims he began treating Mr. Gomez on January 11, 2001. (Exhibit A, ¶ 4; Exhibit 1, p. 2, Plaintiff's Exhibit B, p. 1.)
19. Dr. Uzoaru's note from January 11, 2001 reads as follows:
   Mr. Gomez says his problems are not resolved. He has great hesitancy. His problem started when he was asked to "drop" by security officer. (Exhibit A, ¶ 5; Exhibit 1, p. 2) He does not have a large prostate. I treated him for prostatitis. I think he has a nervous bladder. (Exhibit A, ¶ 5; Exhibit 1, p. 3.)
20. Mr. Gomez made these complaints to Dr. Uzoaru. Based upon Dr. Uzoaru's examination of Mr. Gomez, Dr. Uzoaru believed he had prostatitis. Dr. Uzoaru treated him with Urecholine, a medication for this condition. (Exhibit A, ¶ 6; Exhibit 1, p. 3.)
21. Dr. Uzoaru's reference to "hesitancy" in Mr. Gomez's note relates to hesitancy or difficulties with urinating when asked to "drop" by security, which makes reference to a request by the security office for an inmate, Mr. Gomez in this instance, to provide a urine sample for urine testing. (Exhibit A, ¶ 7.)
22. Mr. Gomez was seen by a nurse on February 22, 2001 for complaints of back pain. The nurse referred him to Dr. Uzoaru on February 22, 2001. Dr. Uzoaru's note from that date reads as follows:
   S (subjective): LBP (low back pain). Dystonic bladder (which is a nervous bladder).

        A (assessment): Med refill.
        P (plan): Urecholine, Naprosyn. (Exhibit A, ¶ 8; Exhibit 1, p. 6.)

23. On February 22, 2001, Mr. Gomez continued to make complaints of low back pain. Dr. Uzoaru diagnosed him with a dystonic or nervous bladder. Dr. Uzoaru provided him with a refill of his medications, including the Urecholine and Naprosyn for pain. Mr. Gomez was also going to be seen by an orthopedic physician in the near future. (Exhibit A, ¶ 9.)

24. Mr. Gomez was evaluated on March 22, 2001 by Dr. Bavishi, the orthopedic physician. (Exhibit A, ¶ 10; Exhibit 1, p. 5.) Dr. Bavishi performed an evaluation and made recommendations. With the exception of back brace, those recommendations were carried out by Dr. Uzoaru's recommendations. (Exhibit A, ¶ 10, Plaintiff's Exhibit A, p. 3.)

25. Dr. Uzoaru next saw Mr. Gomez on May 9, 2001. His note from that date reads as follows:
        S (subjective): F/U (follow-up). Back problem. Seen by ortho on 3/22/01. Ordered exercise, back brace, low bunk. Patient also complaining about benching 275[2] pounds down from 325 pounds.
        Lifts weights 5 days a week
        A (assessment): LB (low back) strain.
        P (plan): Low bunk, back brace, HIV test-RPR (syphilis) test. (Exhibit A, ¶ 11; Exhibit 1, p. 7.)

26. On May 9, 2001, Dr. Uzoaru saw Mr. Gomez and evaluated him for his complaints of ongoing back problems. Dr. Uzoaru noted the orders by the orthopedic physician and followed through with them per his plan. At that time, Mr. Gomez complained that he was able to lift 275 pounds down from 325 pounds. He was lifting 5 days per week at this time. Pursuant to his complaints and his abilities, Dr. Uzoaru diagnosed Mr. Gomez with low back strain. (Exhibit A, ¶ 12.)

27. The next time Dr. Uzoaru saw Mr. Gomez was on May 18, 2001. On that date, his note reads as follows:
        S (subjective): Chronic LBP (low back pain) and shaking legs.
        O (objective): CNS (central nervous system) DTR (deep tendon reflexes) 3+ LE (lower extremities), 2+ UE (upper extremities).
        A (assessment): LB (low back) strain.
        P (plan): Refer to neurology for NSC (nerve conduction studies)/EMG. Tylenol. (Exhibit A, ¶ 13; Exhibit 1, p. 9.)

28. Pursuant to his examination and evaluation of Mr. Gomez on May 18, 2001, Dr. Uzoaru found that Mr. Gomez continued to have low back strain. However, based upon his ankle clonus, which can occur during examination or while walking, it was Dr. Uzoaru's opinion that Mr. Gomez should be referred to neurology for further neurological studies. Dr. Uzoaru followed through with these referrals. (Exhibit A, ¶ 14; Exhibit 1, p. 9.)

---

[2]In response, Plaintiff claims 175 pounds, rather than 275 pounds, but this fact is not dispositive.

29. Dr. Uzoaru's personal evaluation found Mr. Gomez within normal limits; however, the plaintiff did have some positive findings on examination in the form of the ankle clonus. Exhibit A, ¶ 15.)
30. As Dr. Uzoaru was unsure of the cause of the ankle clonus, Dr. Uzoaru referred the patient to see neurology for an opinion regarding this. (Exhibit A, ¶ 16.)
31. Mr. Gomez was sent to Dr. Tazudeen, a neurologist in Danville, Illinois. (Exhibit A, ¶ 17; Exhibit 1, p. 90.)
32. Dr. Tazudeen performed an EMG/nerve conduction study. Dr. Tazudeen's report under the "Impression" section states as follows:
    > EMG/NC (nerve conduction) studies of both LES (lower extremities) are normal. No neuropathy or root irritation seen.
    (Exhibit A, ¶ 18; Exhibit 1, p. 90.)
33. Mr. Gomez then followed up with Dr. Bavishi, the orthopedic physician, on June 28, 2001. Dr. Bavishi noted that the patient had been seen by the neurologist. He performed an X-ray of the patient's lumbar spine. His recommendation was to continue with the elastic back support and back exercises. Dr. Uzoaru had no reason to dispute Dr. Bavishi's recommendations. (Exhibit A, ¶ 19; Exhibit 1, p. 10.)
34. Dr. Uzoaru personally next saw Mr. Gomez on July 15, 2001. His note from that date reads as follows:
    > S (subjective): To rule out MS (multiple sclerosis), was seen by neurologist 6/7/01. Await MRI brain/spinal cord.
    > P (plan): Return as needed. (Exhibit A, ¶ 20; Exhibit 1, p. 11.)
35. Pursuant to Dr. Uzoaru's recommendation, Mr. Gomez received an MRI of the lumbar spine on August 3, 2001. Under the "Impression" section of that report, the physician noted moderately large central disc herniation at L3-L4 with impression on the thecal sac. There was mild central disc herniation at L4-L5 with mild compression. The remaining spaces were unremarkable. (Exhibit A, ¶ 21; Exhibit 1, p. 81.)
36. Dr. Uzoaru next saw Mr. Gomez on September 4, 2001. His notes from that date read as follows:
    > S (subjective): LBP (low back pain) 5 days. Pulled back bending over to move an object.
    > A (assessment): Low back sprain.
    > O (objective): SLR (straight leg raise) right. Tender right paraspinalous (the muscle alongside the right side of the spine).
    > P (plan): Low gallery. Flexeril, Naprosyn. (Exhibit A, ¶ 22; Exhibit 1, p. 15.)
37. Pursuant to his examination and evaluation of Mr. Gomez on September 4, 2001, Dr. Uzoaru found that Mr. Gomez continued to have some back pain, this time as a result of a new injury where he had pulled his back. Dr. Uzoaru's assessment continued to be low back sprain. Dr. Uzoaru provided a low gallery permit and muscle relaxers as well as pain medication for Mr. Gomez based upon these complaints. (Exhibit A, ¶ 23.)
38. The next time Dr. Uzoaru saw Mr. Gomez was on October 2, 2001. His note from that date reads as follows:
    > S (subjective): Low back strain. Was making bed and back fell out.

        O (objective): No tenderness.
        P (plan): Flexeril, Naprosyn. Slow walk pass. (Exhibit A, ¶ 24; Exhibit 1, p. 16.)

39. On October 2, 2001, Dr. Uzoaru again assessed Mr. Gomez's complaints relating to his back strain. He again reported a new incident where he was making his bed and his back fell out. On examination, there was no tenderness. However, based upon his complaints, Dr. Uzoaru continued the prescriptions for the pain medication and muscle relaxants, as well as a slow walk pass. (Exhibit A, ¶ 25; Exhibit 1, p. 16.)
40. Dr. Uzoaru did not see Mr. Gomez again until January 4, 2002. In the meantime, Mr. Gomez saw Dr. Bavishi with the MRI report, or at least was referred to him to complete that. (Exhibit A, ¶ 26; Exhibit 1, p. 17.)
41. It appears that on November 15, 2001, Mr. Gomez did consult with Dr. Bavishi, the orthopedic physician, regarding his MRI dated August 3, 2001. Dr. Bavishi's recommendation was to return to USMC for a steroid injection. Dr. Uzoaru signed this and approved that this injection take place. (Exhibit A, ¶ 27; Exhibit 1, p. 18.)
42. The next time Dr. Uzoaru saw Mr. Gomez was on January 4, 2002. His note from that date reads as follows:
        S (subjective): Lumbar sacral pain getting worse. History of herniated lumbar discs. Pain radiates to legs.
        O (objective): SLR (straight leg raises) positive bilaterally. Tender lumbosacral. Decreased range of motion of hip.
        A (assessment): Herniated lumbar disc; low back strain.
        P (plan): Flexeril, Motrin, benzoyl peroxide. (Exhibit A, ¶ 28; Exhibit 1, p. 21.)
43. On January 4, 2002, Mr. Gomez complained of pain in his lumbar sacral area. Dr. Uzoaru diagnosed him as possibly having herniated lumbar discs based upon the prior diagnostic tests. Dr. Uzoaru prescribed pain medication and muscle relaxants. At the same time, Dr. Uzoaru continued to schedule Mr. Gomez for further diagnostic testing. (Exhibit A, ¶ 29.)
44. The next time Dr. Uzoaru saw Mr. Gomez was on February 20, 2002. The plaintiff continued to make similar complaints. (Exhibit A, ¶ 30; Exhibit 1, p. 25.) As the plaintiff was already scheduled to have epidural steroid injections, no additional treatment was provided other than hot packs applied. (Exhibit A, ¶ 30; Exhibit 1, p. 25.)
45. The next time Dr. Uzoaru saw Mr. Gomez was on March 7, 2002. (Exhibit A, ¶ 31; Exhibit 1, p. 28.) On that date, his note reads as follows:
        S (subjective): Back from USMC for epidural steroid injections. Could not be done because of thin blood due to too much ibuprofen. I have counseled the patient about this to stop ibuprofen for one week.
        A (assessment): Low back strain.
        P (plan): Repeat epidural in one week. Discontinue ibuprofen until MD says is okay.
        (Exhibit A, ¶ 31; Exhibit 1, p. 28.)
46. Mr. Gomez was sent out for his epidural steroid injection, but could not receive it due to thin blood. Dr. Uzoaru discontinued the ibuprofen in an effort to resolve this condition.

Dr. Uzoaru also scheduled Mr. Gomez to return once the problem was resolved. (Exhibit A, ¶ 32.)

47. Dr. Uzoaru next saw Mr. Gomez on March 28, 2002. His note from that date references the patient was treated for acne. That does not appear to be an issue referenced in this case. (Exhibit A, ¶ 33; Exhibit 1, p. 30.)

48. The next time Dr. Uzoaru saw Mr. Gomez was on May 2, 2002. (Exhibit A, ¶ 34; Exhibit 1, p. 33.) However, in the meantime, Mr. Gomez had been sent out for his epidural steroid injection on April 15, 2002. (Exhibit A, ¶ 34; Exhibit 1, p. 32.)

49. When Dr. Uzoaru saw Mr. Gomez on May 2, 2002, his note reads as follows:
    S (subjective): Two-week post-epidural injection. Patient still complaining of shaking legs and low back pain.
    A (assessment): Low back pain.
    P (plan): Extra mattress. Referred to ortho for June.
    (Exhibit A, ¶ 35; Exhibit 1, p. 33.)

50. Pursuant to the plaintiff's continued complaints, Dr. Uzoaru recommended that Mr. Gomez see the orthopedic physician once again. (Exhibit A, ¶ 36.)

51. This visit took place on May 23, 2002. (Exhibit A, ¶ 37; Exhibit 1, p. 34.) At that time, Dr. Bavishi recommended that the patient see a neurosurgeon. (Exhibit A, ¶ 37; Exhibit 1, p. 34.)

52. Dr. Uzoaru did not disagree with Dr. Bavishi's recommendations. (Exhibit A, ¶ 38.)

53. Dr. Uzoaru saw Mr. Gomez on June 26, 2002. His note from that date reads as follows:
    S (subjective): Patient still complaining of pain on both hamstrings. Patient has no back pain anymore. I will start on Baclofen (a muscle relaxant).
    A (assessment): Herniated lumbar disc.
    P (plan): Motrin and Baclofen. Return as needed.
    (Exhibit A, ¶ 39; Exhibit 1, p. 35.)

54. While waiting for Mr. Gomez's referrals to be scheduled and received, Dr. Uzoaru treated him with pain medication and muscle relaxants to help alleviate his complaints of pain. (Exhibit A, ¶ 40.)

55. Dr. Uzoaru next saw Mr. Gomez on November 9, 2002. His note from that date reads as follows:
    S (subjective): Spinal cord lesion, rule out MS. Still has hesitancy. I will seek a second opinion on MRI. Patient's symptoms are exacerbated in episodic fashion. (Exhibit 1, p. 37.) Tremulous spasticity ankle clonus.
    A (assessment): Questionable MS.
    P (plan): Vitamin B-12 injection. Doxycycline, Triamcinolone. Return in 6 weeks.
    (Exhibit A, ¶ 41; Exhibit 1, p. 38.)

56. In August of 2002, Dr. Uzoaru evaluated Mr. Gomez's complaints and attempted to provide him with an injection of B-12 while waiting for word from the experts. (Exhibit A, ¶ 42.)

57. Dr. Uzoaru then saw Mr. Gomez again on September 23, 2002. His note from that date reads as follows:
    > S (subjective): I have explained to Mr. Gomez the neurology consult and the need to rule out MS.
    > A (assessment): Rule out MS.
    > P (plan): Motrin and return as needed.
    > (Exhibit A, ¶ 43; Exhibit 1, p. 38.)
58. An MRI was done on October 7, 2002. (Exhibit A, ¶ 44; Exhibit 1, p. 40.) This was reviewed with Mr. Gomez on December 31, 2002. (Exhibit A, ¶ 44; Exhibit 1, p. 40.)
59. The next time Dr. Uzoaru saw Mr. Gomez was on January 7, 2003. His note from that date reads as follows:
    > S (subjective): Patient informed he will be sent to another neurologist.
    > A (assessment): Rule out MS.
    > P (plan): Return as needed. (Exhibit A, ¶ 45; Exhibit 1, p. 42.)
60. The next time Dr. Uzoaru saw Mr. Gomez was on March 4, 2003. His note from that date reads as follows:
    > S (subjective): Chronic low back pain. History of spinal cord disease. I updated patient with current status of consultations.
    > A (assessment): LBP (low back pain).
    > P (plan): Motrin, benzoyl peroxide, Doxycycline.
    > (Exhibit A, ¶ 46; Exhibit 1, p. 44.)
61. On March 4, 2003, Dr. Uzoaru had a discussion with the patient regarding the status of consultations. As of the last visit, Mr. Gomez had been referred to another neurologist and arrangements were pending. It was Dr. Uzoaru's understanding that the plaintiff would be transferred to another facility to allow better access for these visits. Dr. Uzoaru was continuing to treat Mr. Gomez for his pain with pain medication and for other problems he was having while waiting for these consultation visits to take place. (Exhibit A, ¶ 47.)
62. Dr. Uzoaru next saw Mr. Gomez on April 3, 2003. His note from that date reads as follows:
    > S (subjective): Back and neck pain. Questionable MS. Awaiting arrangements to send to U of I Hospital - Chicago neurology department.
    > A (assessment): Questionable MS.
    > P (plan): Darvocet.
    > (Exhibit A, ¶ 48; Exhibit 1, p. 46.)
63. At this time, Dr. Uzoaru was still waiting for arrangements for the plaintiff to see the neurology department at the University of Illinois at Chicago. In the meantime, Dr. Uzoaru provided Mr. Gomez with additional pain medication in the form of Darvocet. (Exhibit A, ¶ 49.)
64. Dr. Uzoaru next saw Mr. Gomez on April 30, 2003. His note from that date reads as follows:

    S (subjective): Herniated lumbar discs. Complains of pain
    exacerbation.  Questionable MS.
    A (assessment): Lumbar disc.
    P (plan): Hold over hot packs. Darvocet. Extra mattress.
    (Exhibit A, ¶ 50; Exhibit 1, p. 47.)

65. On April 30, 2003, the patient continued to have problems relating to his herniated lumbar discs.  Dr. Uzoaru was still waiting for the patient to be seen at the University of Illinois at Chicago.  Dr. Uzoaru continued the Darvocet prescription and also ordered hot packs, as well as an extra mattress for his comfort. (Exhibit A, ¶ 51.)

66. Mr. Gomez was transferred from the Danville Correctional Center on June 2, 2003 to another facility.  (Exhibit A, ¶ 52; Exhibit 1, p. 48.)

67. Mr. Gomez was returned to the Danville Correctional Center on June 16, 2003.  (Exhibit A, ¶ 53; Exhibit 1, p. 52.)

68. Prior to that time, a note was made in Mr. Gomez's chart referencing a problem concerning the patient's transfer to the Dixon Correctional Center, which was deemed to be inappropriate and therefore he was sent back to Danville. (Exhibit A, ¶ 54; Exhibit 1, pp. 51, 53.)

69. Upon Mr. Gomez's return to the Danville Correctional Center, Dr. Uzoaru saw Mr. Gomez on June 18, 2003.  His note from that date reads as follows:
    S (subjective): Patient back from Dixon. Missed U of I
    appointment on 6/12.  Will reschedule. (Exhibit A, ¶ 55; Exhibit 1,
    p. 54.)

70. For some reason, Mr. Gomez missed his visit due to his transfer to the other facility.  Dr. Uzoaru had no reason to know Mr. Gomez would not be sent out for his visit and is unaware of the specific problem encountered. (Exhibit A, ¶ 56.)

71. Nevertheless, Dr. Uzoaru saw Mr. Gomez again on June 27, 2003.  At that time, his note reads as follows:
    S (subjective):  I spoke with Dr. Elyea at 1400 hours regarding
    need for Gomez to have another opinion at University of Illinois at
    Chicago.  Dr. Elyea agreed to this proposal and wants us to make
    an appointment and contact Cindy Hobrock. (Exhibit A, ¶ 57;
    Exhibit 1, p. 56.)

72. Dr. Elyea is the Agency Medical Director for the Illinois Department of Corrections.  Dr. Uzoaru discussed Mr. Gomez's condition with Dr. Elyea, who agreed that Mr. Gomez should be reevaluated by the University of Illinois at Chicago.  Dr. Uzoaru coordinated with his staff person, Cindy Hobrock, in order to arrange that visit. (Exhibit A, ¶ 58.)

73. Dr. Uzoaru's next visit with Mr. Gomez took place on August 7, 2003.  His note from that date reads as follows:
    S (subjective): Here requesting pain meds, acne meds, and low
    back renewal.
    A (assessment): Med refill. Low back renewal.
    P (plan): Motrin, benzoyl peroxide, low bunk.
    (Exhibit A, ¶ 59; Exhibit 1, p. 58.)

74. Dr. Uzoaru next saw Mr. Gomez on September 3, 2003. His note from that date reads as follows:
    > S (subjective): Follow-up U of I appointment. I will let Mr. Gomez know what I receive from U of I Chicago neurology department.
    > A (assessment): Rule out MS.
    > P (plan): Slow walk and low gallery.
    > (Exhibit A, ¶ 60; Exhibit 1, p. 60.)
75. As of September 3, 2003, Dr. Uzoaru discussed the plaintiff's visits to the University of Illinois at Chicago. He issued a slow walk and low gallery. (Exhibit A, ¶ 61.)
76. Dr. Uzoaru next saw Mr. Gomez on November 14, 2003. His note from that date reads as follows:
    > S (subjective): Came to discuss MRI report of neck and brain. Med refill. DJD (degenerative joint disease) C-spine and L-spine, acne face and back.
    > A (assessment): DJD (degenerative joint disease) C-spine. Acne.
    > P (plan): State boots. Motrin, Erythromycin. Back pain MRI of C-spine alignments.
    > (Exhibit A, ¶ 62; Exhibit 1, p. 62.)
77. The plaintiff had received an MRI of the C-spine. Pursuant to the MRI of the brain and of the cervical spine, the cervical findings revealed that the alignments of the cervical vertebral bodies were normal. The plaintiff did have degenerative disc disease present at C2-3, C3-4, and C5-6. (Exhibit A, ¶ 63; Exhibit 1, p. 82.) The patient was provided pain medication and other medications for his other problems. (Exhibit A, ¶ 63.)
78. Subsequent to that date, Dr. Uzoaru did not see Mr. Gomez again. (Exhibit A, ¶ 64.)
79. To Dr. Uzoaru's understanding, Mr. Gomez was followed up by other physicians. (Exhibit A, ¶ 65.)
80. Plaintiff's medical records reflect that he was sent out for the medical furlough to the U of I medical center for further consultation. (Exhibit A, ¶ 66; Exhibit 1, p. 63.)
81. As Dr. was no longer treating Mr. Gomez, he longer was involved in Mr. Gomez's care to any degree. (Exhibit A, ¶ 67.)
82. However, the records do reflect that Mr. Gomez was sent out for a consultation with a neurosurgeon. (Exhibit A, ¶ 68; Exhibit 1, pp. 62-63.)
83. It is Dr. Uzoaru's opinion Mr. Gomez was treated appropriately for the complaints made. His diagnostic tests were evaluated. Care and treatment was provided based upon those recommendations. (Exhibit A, ¶ 69.)
84. Not only did Mr. Gomez receive consultations from an orthopedic physician who came onsite, he was also seen by neurologists and obtained MRIs of both the lumbar and cervical spine, as well as his brain. Care and treatment was provided based upon the radiological and other diagnostic findings. (Exhibit A, ¶ 70.)
85. In addition, Mr. Gomez received epidural steroid injections. (Exhibit A, ¶ 71.)
86. Dr. Uzoaru also treated Mr. Gomez with pain medications, including Naprosyn and Flexeril, as indicated herein. (Exhibit A, ¶ 72.)

87. Dr. Uzoaru did not treat Mr. Gomez after late 2003 as Dr. Uzoaru no longer was working at the Danville Correctional Center. (Exhibit A, ¶ 73.)
88. At no time during the time that Dr. Uzoaru was providing care and treatment to Mr. Gomez did any of the expert consultants recommend that Mr. Gomez have surgery. All of the recommendations made by the consultants were followed through and provided to Mr. Gomez. (Exhibit A, ¶ 74.)
89. Dr. Rowe did not treat Mr. Gomez directly. (Exhibit A, ¶ 75.)
90. Although Dr. Rowe may have denied some of the requests for consultation initially, later requests for consultation were approved[3]. (Exhibit A, ¶ 76.)
91. It is Dr. Uzoaru's recollection, based upon his experience and his review of plaintiff's records, that the consultations recommended for Mr. Gomez were obtained. (Exhibit A, ¶ 77.)
92. Dr. Uzoaru is not aware of any harm sustained by Mr. Gomez as a result of any delays. Accordingly, in his opinion, the delays are of minimal or no consequence to Mr. Gomez. (Exhibit A, ¶ 78.)
93. The medical records Dr. Uzoaru relied upon were made in the ordinary course of business. (Exhibit A, ¶ 79.)
94. Defendant, Dr. Uzoaru admits that he was aware of the possibility of spinal cord compression via neurologist, Dr. Tazudeen's June 7, 2001 examination. See Uzoaru's Response [120].
95. Defendant Dr. Uzoaru admits that he received a facsimile (fax) dated July 20, 2001, from Dr. Row, Vice President and Chief Medical Officer for Wexford Health Sources, Inc., indicating that he would "approve MRI of cervical spine only as per phone conversation with (you) Dr. Uzoaru today @ 1415 (?)." Dr. Uzoaru found no reason to appeal the denial at that time. See Uzoaru's Response [120]
96. Plaintiff had continual complaints of hesitance and frequent urination on Jan. 11, 2001, and Feb. 22,2001, plaintiff was prescribed a medication called Urcholine. Plaintiff continued to complain of bladder problems on the following dates: May 9, 2001, Feb. 4, 2002, May 2, 2002, Sept. 23, 2002, and Jan. 7. 2003. See Uzoaru's Response [120]

### Discussion and Conclusion

The plaintiff's allegations, deposition testimony and medical records fail to support a claim for deliberate indifference against the defendants. There is no genuine issue of material fact in this case. Defendants do not dispute that Juan Gomez may have had some delay between the date an MRI was recommended for him and the date the MRI was actually obtained. The same is true with respect to the request for the steroid injection and the neurology consult.

---

[3]Plaintiff alleges that his condition may have been different had he been seen sooner; however, there is no medical evidence of this. Although, in his response and attached exhibits [118], Plaintiff makes reference to having seen other physicians who he claims to have made certain statements, these statements are not evidence as they are hearsay and may not be considered in order to create an issue of fact.

11

However, just because Plaintiff may have suffered a delay, this does not in and of itself constitute deliberate indifference. The plaintiff states his complaint against Dr. Uzoaru is not about delay in medical treatment, but instead inadequate medical treatment and deliberate indifference. The plaintiff claims his complaint against Wexford is based on delay and denial of medical treatment.

In order to prove his cause of action, the Plaintiff must prove deliberate indifference to his serious medical needs. At a minimum, this requires actual knowledge of impending harm, which is easily preventable, so that a conscious, capable refusal to prevent harm can be inferred from the defendant's failure to prevent it. *Dixon v. Godinez*, 114 F.3d 640, 645 (7th Cir. 1997); *Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir. 1985). Deliberate indifference is more than mere negligence and approaches intentional wrongdoing. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). To establish deliberate indifference, Plaintiff must show the Defendants ignored a known risk. *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1988). Additionally, in order to establish deliberate indifference, plaintiff must show that the physician or other defendant must both have been aware of the fact from which the inference could be drawn that a substantial risk of serious harm exists, and he must actually draw the inference. *Higgins v. Correctional Medical Services*, 178 F.3d 508, 511 (7th Cir. 1999); *Sanderfer v. Nichols*, 62 F.3d 151, 154 (6th Cir. 1995).

The exercise by a physician of his professional judgment does not constitute deliberate indifference. *Youngber v. Romeo*, 457 U.S. 307, 322-323 (1982). Medical decisions, such as whether one course of treatment is preferable to another, are beyond the Eighth Amendment's purview. Additionally, the Eighth Amendment is not a vehicle for bringing claims of medical malpractice. *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996). It should also be kept in mind that inappropriate medical treatment based on pure negligence, or even a series of purely negligent acts is not the same as indifference to a serious medical need. *Sellers v. Hennan*, 41 F.3d 1100, 1102-03 (7th Cir. 1994). While a prisoner has the right to medical care, he does not have the right to determine the type and scope of the medical care he personally desires. However, malpractice or disagreement with a doctor's treatment decisions cannot be the basis for an Eighth Amendment challenge. *Steele v. Choi*, 82 F.3d 175, 178-79 (7th Cir. 1996); *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). A difference of opinion between a physician and the patient does not give rise to a constitutional right, nor does it state a cause of action under § 1983. *Coppinger v. Townsend*, 398 F.2d 392, 394 (10th Cir. Col. 1968).

Inattention to a medical condition amounts to a constitutional violation only where the medical condition is serious. *Brownell v. Figel*, 950 F.2d 1285, 1289 (7th Cir. 1991). As previously indicated, deliberate indifference may only be found when an official knows of and disregards an excessive risk to inmate health or safety. *See Duane v. Lane*, 959 F.2d 673, 676 (7th Cir. 1992). Deliberate indifference also requires that defendants either intended to harm plaintiff or knew of a risk of harm so significant that an intent to harm could be inferred from a

refusal to provide medical care. *See Smith-Bey v. Hospital Administrator*, 841 F.2d 751, 759 (7th Cir. 1988).

The plaintiff's claims against Dr. Rowe and Wexford fail as there is no respondeat superior under § 1983 and the plaintiff has no evidence to support a claim that the corporate defendants violated his constitutional rights. Plaintiff's claim of deliberate indifference as to Wexford and Dr. Rowe purportedly stem from allegations of policy, customs, practices, acts, and omissions of the Defendants which were knowing, conscious, deliberate, and intentional. See Plaintiff's complaint [8]. Other than Plaintiff's bold allegations, the Plaintiff has no admissible evidence to support these allegations. To begin, Dr. Rowe is a physician, but did not have any direct contact in caring for or treating the Plaintiff for any of his complained-of ailments. Dr. Rowe's involvement was limited to reviewing and approving requests for authorizations for specifics types of medical care. For some of the authorization requests, there were denials by Wexford via Dr. Rowe. However, upon re-submission, these requests were later approved. Corporate defendants cannot be held responsible for the acts or omissions of its employees as there is no respondeat superior in 1983 actions. *Iskander v. Village of Forrest Park*, 690 F.2d 126, 128 (7th Cir. 1982). In order to state a cause of action against a corporate defendant, municipality, or similar entity, the plaintiff must demonstrate that a constitutional deprivation occurred as the result of an expressed policy or custom. *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760 (7th Cir. 2002). Other situations in which a corporate defendant may violate the constitutional rights of another as a result of its policies would include the following: (1) An express policy, that when reinforced causes a constitutional deprivation; (2) a widespread practice, that although not authorized by written law or express policy is so permanent or well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person of final policy making authority. *Baxter v. Bible County School Corp.*, 26 F.3d 728 (7th Cir. 1994). In this case, there is no suggestion of an express policy of the Defendants which caused a constitutional deprivation. Moreover, there is no evidence to create a genuine issue of material fact that a widespread practice was so permanent and well settled as to constitute a custom or usage with the forces of law. Although Plaintiff claims that his requests for outside consultations were denied, each and every one these consultations was eventually approved. Plaintiff has not alleged a custom or practice which constitutes a constitutional deprivation as Plaintiff's care and treatment was ultimately provided as recommended, admittedly with a delay. Plaintiff has failed to establish any facts to assert that any of the Defendants participated in a policy or custom which violated the Plaintiff's constitutional rights. At best, Plaintiff has shown that his own requests for care were initially denied. The fact that Wexford subsequently approved these requests for care is evidence in and of itself that there is no custom or policy prohibiting or preventing these procedures or consultations for inmates. As there is no respondeat superior theory available to the Plaintiff with respect to Wexford Health Sources, Inc. as a defendant, Wexford is entitled to summary judgment.

Further, the facts show that the Plaintiff suffered no harm as a result of the delays as his care and treatment was not altered in any significant manner even after the consultations were obtained. In his Complaint, the Plaintiff seems to suggest that he suffered an unnecessary delay

in receiving surgery. When arguing a delay case, the Plaintiff must show with verifying medical evidence that the delay caused him actual physical harm. There is no such evidence in this case. An inmate who complains that delay in medical treatment rose to a constitutional violation must place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment to succeed."' *See Langston v. Peters*, 100 F.3d 1235, 1240-41 (7th Cir. 1996). In this case, the plaintiff has not placed any verifying medical evidence that any delay in medical treatment resulted in a detrimental effect on the plaintiff's health. Therefore, the defendants are entitled to summary judgment for any claims that are based on delay.

Plaintiff asserts in his deposition that his complaint as to Dr. Uzoaru is essentially that he did not diagnose him with a herniated disc soon enough. Plaintiff admits that he was provided with medical care and treatment for the complaints he made to the healthcare unit. Not only did Plaintiff receive multiple X-rays, MRIs, and other care and treatment including pain medication with respect to his complaints, he was also provided with outside medical consultations by neurologists and also seen by an orthopedic consult, Dr. Bavishi. Plaintiff's claim is based upon his dissatisfaction with having to wait for a medical procedure that had been recommended. Plaintiff has not submitted any admissible evidence, except his own uncorroborated testimony, that he suffered any ill effects as a result of the delay in the recommended medical care and treatment. Moreover, the delay in care was minimal at best. Plaintiff admits in his deposition that he received all of the care and treatment recommended by Dr. Uzoaru. Plaintiff has not proven his claim of inadequate medical care and deliberate indifference by Dr. Uzoaru, with respect to Plaintiff's various medical conditions. There is no evidence in this case to support Plaintiff's contention that any of the Defendants were deliberately indifferent to his serious medical needs. At no time was the inmate ever at risk of suffering from a significant and pending harm created by the failure to provide Plaintiff with an MRI, a neurological consult, or a back brace. As Plaintiff has been provided with all of the care and treatment he requested even though he is not entitled to choose his own medical care as a non-medical provider, Defendants are entitled to summary judgment as the acts or omissions on the part of the Defendants do not constitute deliberate indifference as a matter of law.

Based upon the foregoing, Defendants in this cause of action are entitled to summary judgment. There is no genuine issue of material fact disputing any of the Defendants' arguments. Moreover, there is no evidence to suggest that this Plaintiff was in danger of impending harm as result of his existing medical conditions. Moreover, there is no evidence to suggest that any of the Defendants believed the patient suffered from a serious medical need that was not treated. To the contrary, the Plaintiff's medical records establish that he was seen regularly and provided not only care and treatment by his regular physician, Dr. Uzoaru, but also orthopedic consults, neurology consults, and a neurosurgeon.

Finally, the court notes that the Plaintiff named Jeff Romig as a defendant in this case. In his complaint, the Plaintiff stated that Jeff Romig was at one time the Health Care Administrator at Danville Correctional Center. The court notes that the Plaintiff made no specific allegations against Romig, and therefore, Romig is dismissed as a defendant pursuant to Fed. R. Civ. Pro. Rule 12(b)(6).

14

It is therefore ordered:

1. Pursuant to Fed. R. Civ. Pro. Rule 12(b)(6), the Defendant, Jeff Romig is terminated as a defendant.
2. Pursuant to Fed. R. Civ. Pro. Rule 56(c), the Defendants' motion for summary judgment [110] is allowed. The clerk of the court is directed to enter judgment in favor of the Defendants and against the Plaintiff. This lawsuit is closed in its entirety. The parties are to bear their own costs.
2. If the plaintiff wishes to appeal this decision, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate a strike under 28 U.S.C. 1915(g).

Enter this   30th   day of September 2008.


/s/ Michael P. McCuskey
_____
Michael P. McCuskey
Chief United States District Judge